**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| In re: | (Chapter 11) |
| Prepaid Wireless Group, LLC, | Case No. 24-18852 (MCR) |
| Debtor. | |

**T-MOBILE'S OBJECTION TO THE DISCLOSURE STATEMENT
TO ACCOMPANY PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTOR**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................3

I.    T-Mobile ......................................................................................................................3

II.   The Debtor ...................................................................................................................3

III.  T-Mobile's pre-petition interactions with the Debtor ................................................4

IV.   The Q Link Breach ......................................................................................................6

V.    The Debtor's Rule 2004 Discovery Delay Tactics .....................................................8

VI.   The Disclosure Statement and Plan ..........................................................................10

ARGUMENT ......................................................................................................................11

I.    The Plan Is Unconfirmable .......................................................................................13

      A.    The Disclosure Statement and Plan fail to address all of T-Mobile's claims ........13

      B.    The Debtor's proposed plan contributions are illusory and non-binding ..............14

      C.    The Debtor improperly seeks to modify the WSA in its Plan ..............................16

            1.    The Debtor and the Court cannot prospectively modify the WSA ...........17

            2.    The Court cannot prospectively modify the WSA because any
                  disputes thereunder are subject to mandatory arbitration ........................18

      D.    The Debtor's proposed modifications to the WSA are impermissible .................21

      E.    The Debtor seeks an impermissible assumption of the WSA ..............................25

            1.    The Debtor is unwilling to timely cure its WSA breaches .......................26

            2.    The Debtor fails to provide adequate assurance of its future
                  performance ..............................................................................................28

      F.    The Debtor seeks to reduce the assumption cure cost in violation of the
            WSA ....................................................................................................................30

      G.    The Plan impermissibly gerrymanders T-Mobile's Services Claim separate
            from Class 4 claims to engineer a potential accepting impaired class .................32

H.    The Debtor artificially impairs Class 4 claims to engineer a potential accepting impaired class ........................................................................................34

II.    The Disclosure Statement Is Fatally Vague And Incomplete ...........................................36

CONCLUSION...............................................................................................................................38

T-Mobile USA, Inc. ("T-Mobile"), through its undersigned counsel, hereby objects to the Disclosure Statement to Accompany Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Debtor (the "Disclosure Statement"), and in support thereof states as follows:

## INTRODUCTION

The Debtor has presented a plan that is patently unconfirmable and a proposed Disclosure Statement that fails to provide adequate information on a range of essential issues. The Debtor has attempted to hide the deficiencies of the Plan and Disclosure Statement by stonewalling discovery throughout this bankruptcy. Even the minimal information that the Debtor has provided to date, however, makes clear that this bankruptcy process is not a good faith effort to restructure the existing obligations of a debtor to maximize value for all stakeholders. It is instead the latest chapter in the year-long campaign by the Debtor's controlling shareholder, Paul Greene ("Greene"), to rewrite the prospective terms of the Debtor's contract with T-Mobile, the Wholesale Supplement Agreement (as amended, the "WSA"), while secreting away tens of millions of dollars that should have been paid over to T-Mobile.

The Debtor is a shell entity. It serves no business purpose other than to provide judgment protection for Greene and his assets. It has no employees. It has no true customers. Its sole source of revenue is its contract with its wholly-owned non-debtor operating subsidiary, Prepaid Wireless Wholesale, LLC ("PWW"). The contract nominally requires PWW to contribute to the Debtor the cost of the T-Mobile contract plus a fixed percentage to the Debtor. But that arrangement is in fact a sham. PWW merely contributes whatever amounts may be needed by the Debtor.

T-Mobile is the Debtor's sole secured creditor. It has a lien on all the Debtor's assets as security for a $64 million secured claim. T-Mobile is also by far the Debtor's largest unsecured

creditor because it has a $4.5 million unsecured claim in addition to any deficiency claim that may exist on its secured claim.

The Debtor is proposing a plan of reorganization (the "Plan") that is patently unconfirmable because it fails to respect T-Mobile's prospective rights under the WSA, its rights as a secured lender and its rights as the Debtor's largest unsecured creditor. Specifically, the Plan is unconfirmable because, among other things: (a) the Plan and Disclosure Statement fail to address claims of T-Mobile exceeding $35 million; (b) the Debtor's proposed plan contributions are illusory and non-binding on the contributing parties; (c) it would impermissibly modify the prospective terms of the Debtor's agreement with T-Mobile that the Plan proposes to assume; (d) it would impermissibly assume that agreement without timely paying the appropriate cure cost; (e) it would impermissibly gerrymander T-Mobile's claims to engineer a potential accepting impaired class; and (f) it would artificially impair Class 4 claims to engineer a potential accepting impaired class. It would be a waste of the parties' and the Court's resources to permit the Debtor to solicit ballots on this unconfirmable plan, and the Disclosure Statement should be rejected on that basis.

The Disclosure Statement also fails to provide adequate information sufficient to enable a hypothetical investor to make an informed decision on whether to vote in favor of the proposed chapter 11 plan, as required under Section 1125(b) of the Bankruptcy Code. This is a "trust me" plan that relies upon what appear to be voluntary contributions by the Debtor's operating subsidiary and affiliate. The Disclosure Statement, however, discloses no financial information and projections for those entities. The Disclosure Statement also fails to disclose: (a) a proposed plan treatment for all of T-Mobile's claims, which comprise more than 90% of all non-governmental claims; (b) evidence that the Debtor's plan funders agree to be bound by, and guaranty payments under, the Plan; (c) the cure amount associated with the Debtor's proposed

180616577.1

assumption of the WSA; and (d) the specific revisions to the Debtor's contract with T-Mobile that the Debtor (improperly) seeks the Court's approval to make unilaterally against T-Mobile's objection. Despite these deficiencies, the Debtor asks the Court to approve its Disclosure Statement and simply trust the Debtor's Plan. That approach is impermissible under Section 1125(b) of the Bankruptcy Code.

For these reasons, and as explained in more detail below, the Court should deny approval of the Disclosure Statement.

## BACKGROUND

### I.    T-MOBILE

T-Mobile, like AT&T and Verizon, is a mobile network operator ("MNO") that has invested billions of dollars into its mobile network to offer consumer cellular services nationwide. T-Mobile enters partnerships with wholesale wireless providers known as mobile virtual network operators ("MVNOs"), which allow MVNOs to use T-Mobile's mobile wireless network infrastructure at wholesale prices. The MVNOs can then offer cellular service to consumers. Instead of entering a partnership directly with T-Mobile, or another MNO, some MVNOs contract with another intermediary, known as an aggregator, and also known as a mobile virtual network aggregator, which partners directly with T-Mobile or another MNO. The MVNOs that partner with an aggregator tend to be smaller than MVNOs that directly partner with T-Mobile or other MNOs.

### II.    THE DEBTOR

The Debtor is the holding company for its 100% owned operating subsidiary, PWW. Contrary to what the Debtor represented at the first day hearing, the Debtor has no employees. Any employees are employed by non-debtor PWW. All of the customer relationships are at the PWW level. Many of the Debtor's creditor relationships are also at the PWW level.

The Debtor has contracted with T-Mobile under the WSA for the use of T-Mobile's wireless network infrastructure. The Debtor, in turn, sells such services to PWW, which sells the services to MVNOs. The T-Mobile contract has been amended thirteen times, most recently on June 11, 2022 (as amended, the "WSA"). A copy of the WSA, and the Thirteenth Amendment thereto is attached as <u>Exhibit A</u>. PWW is a co-obligor under the WSA. Greene and the Debtor's affiliate, X Wireless, LLC ("X Wireless") executed guaranties the Debtor's obligations under the WSA.

The Debtor and PWW have a contract under which PWW nominally pays the Debtor a certain percentage over the amount of the Debtor's payment obligations to T-Mobile under the WSA. The Debtor's contract with PWW is the Debtor's sole source of revenue. This arrangement, at least in practice, is functionally a sham given that PWW has simply contributed whatever amount the Debtor has needed on a month-to-month basis to pay its obligations. As a result of this arrangement, the Debtor has long been insolvent given that PWW has contributed far more than required under its contract with the Debtor. The Debtor at present owes nearly $280 million in intercompany payables to PWW. Dkt. 56 at 4 ("Loan from PW Group" balance sheet line item). The PWW-Debtor business arrangement appears to serve no business purpose other than an attempt at judgment protection for both entities.

The Debtor and PWW are embedded in a web of interrelated affiliates that are ultimately owned and controlled by Greene. The Debtor admits that Greene, "[as] CEO, monitors the [Cash Management System] Bank Accounts and manages the collection and disbursement of funds." Dkt. 3 at ¶ 13.

## III.    T-MOBILE'S PRE-PETITION INTERACTIONS WITH THE DEBTOR

T-Mobile has encouraged and facilitated the Debtor's growth and success. For more than

180616577.1

twelve years, T-Mobile and the Debtor have worked to provide wireless network capacity to MVNOs. When T-Mobile and Sprint merged, T-Mobile undertook the project of migrating the MVNOs operating on Sprint's network to T-Mobile's network. As part of that project, T-Mobile encouraged multiple of those Sprint MVNOs to work with the Debtor.

However, the Debtor's business has been in decline. Prior to the petition date, the Debtor was chronically in arrears on its required payments to T-Mobile under the WSA. For example, the Debtor made substantially late payments for its invoices in August 2023, September 2023, November 2023, December 2023, January 2024, April 2024, May 2024, June 2024, August 2024 and September 2024. By the time that the Debtor filed for bankruptcy, it had failed to pay $32,914,957.18 in invoiced amounts for service rendered prepetition. That amount is due and owing.

During the very period of time that the Debtor was delaying payment to T-Mobile, Greene was draining the Debtor's bank account and transferring tens of millions to himself personally and for the benefit of other companies that he owns, which he did at the same time that he claimed that the Debtor was unable to pay T-Mobile in full. For example, on June 25, 2024 and as permitted under the WSA, T-Mobile delivered a notice to the Debtor advising it that the April and May invoices were past due and that T-Mobile had the right to terminate in the event that neither invoice was paid. Two days later, on June 27, 2024, the Debtor secretly and without disclosure to or permission from T-Mobile transferred $10 million to Greene personally. Such transfer was not made in the ordinary course of the Debtor's business. Rather, upon information and belief, such transfer was made for the purpose of concealing assets that would have otherwise been available to pay T-Mobile's legitimate claim.

Greene and others acting on behalf of the Debtor thereupon embarked on a campaign to

induce T-Mobile to reduce the amount that the Debtor owed by delaying additional payments and falsely representing that the Debtor was unable to pay T-Mobile's invoices in full. As but one example, on July 19, 2024, Greene misrepresented to T-Mobile that "we are giving you what we can." Such representation was made without disclosure of Greene's secret transfer of $10 million to himself personally.

Because the Debtor's representations regarding its inability to pay were materially false when made and/or were rendered misleading through the omission of material information, the statements were made knowingly, recklessly, or negligently. Such representations were material, and were made for the purpose of inducing, and did in fact induce, T-Mobile's reasonable reliance thereupon, including its decision to issue a bill credit in the amount of $31,153,008 to the Debtor on or about August 19, 2024.

T-Mobile has submitted a claim for payment of the $31,153,008 on the grounds that the credit should be rescinded and that the credited amount is therefore due and owing. T-Mobile has also submitted a claim for the $32,914,957.18 prepetition invoiced amount that has not yet been paid. Both claims are secured by all of PWG's assets under the terms of the WSA. As discussed below, the Disclosure Statement only mentions the $32,914,957.18 unpaid amount. It does not mention T-Mobile's claim for rescission of the $31,153,008 credit.

## IV.    THE Q LINK BREACH

The Debtor also breached the WSA and damaged T-Mobile through the actions of its affiliate, Global Connection Inc. of America, LLC d/b/a StandUp Wireless ("StandUp"), which in late 2024 transferred certain subscribers to its platform from a separate MVNO, Q Link Wireless, LLC ("Q Link"), thereby depriving T-Mobile of a valuable payment source.

Q Link had been a separate T-Mobile customer. Its business involved providing T-Mobile's

services to low-income subscribers who were eligible for certain governmental subsidies. One such subsidy was the Lifeline program under which the federal government provided payments directly to the MVNO of $9.25 per month per eligible subscriber.

On October 15, 2024, Q Link's founder pled guilty to various crimes arising from the fraudulent submission of claims to the federal government relating to his business. Prior to the indictment, Greene, who upon information and belief had a personal relationship with the indicted founder, agreed to take control of Q Link's business. In connection with the change of control, Q Link thereupon ceased making payments to T-Mobile.

At the request of the FCC, T-Mobile continued to provide services to Q Link participants in the Lifeline program on the Q Link platform through January 2025. T-Mobile thereby had a right and expectation to receive the $9.25 per month subsidy payment from the federal government.

Rather than cause Q Link to pay T-Mobile for the services it provided to such customers, upon information and belief, Greene schemed to capture the $9.25 for himself and his other businesses. Starting in October 2024, StandUp deceptively represented to Q Link's customers that "Your service just got better! … Q Link is now powered by StandUp Wireless." In fact, StandUp was not powering Q Link. StandUp was merely a separate Greene-controlled entity which, like Q Link, also received its telephone services from T-Mobile. As a result of such deceptive conduct, over 250,000 Q Link subscribers transferred to the StandUp platform together with the attendant subsidy payments that otherwise would have gone to T-Mobile. Such transfers reduced on a dollar-for-dollar basis the subsidy payments that T-Mobile would be entitled to receive had no such deception occurred.

Under the WSA, PWG covenanted among other things that StandUp would not target any

7

sales or marketing efforts towards T-Mobile's other customers, including to Q Link and its subscribers. Additionally, PWG represented that StandUp would not engage in deceptive practices or make misleading representations about StandUp, Q Link, or T-Mobile's services. PWG further covenanted that it would bear responsibility for StandUp's actions in this regard. PWG has thereby breached the WSA causing damage to T-Mobile in the net amount of the lost subsidy payments.

T-Mobile has filed a proof of a claim for $4,278,428 for such lost subsidy payments. This claim, which is unsecured, is not mentioned in the Disclosure Statement.

## V.    THE DEBTOR'S RULE 2004 DISCOVERY DELAY TACTICS

On November 26, 2024, T-Mobile filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for the production of documents and testimony relating to the financial affairs of the Debtor, PWW and their affiliates (the "Rule 2004 Motion"). T-Mobile attached draft proposed document requests to its motion to identify with specificity the documents and information that it was seeking.

On January 2, 2025, the Debtor objected to the Rule 2004 Motion in part because it said that it wanted time to formulate a plan of reorganization without any attendant burdens of responding to discovery requests. Concurrently, non-Debtor objectors Greene, StandUp, and X Wireless filed a separate objection to the Rule 2004 Motion.

The Rule 2004 Motion also sought leave to conduct discovery with respect to Q Link. Q Link has not objected to the Rule 2004 Motion.

On January 15, 2025, the Court issued the Order to Meet and Confer, requiring T-Mobile and the Debtor to "meet and confer regarding the issues raised in the objections to the 2004 Motion and [] make a good faith effort to resolve, or at least narrow, the issues raised therein," and to file a joint status report on February 28, 2025 "detailing the status of (i) T-Mobile's discovery requests,

(ii) any agreed upon specific limitations regarding the discovery requests, and (iii) any agreed upon means for protecting the confidential and proprietary information of any of the parties from whom discovery is sought." Dkt. 94. In the February 28, 2025 Joint Status Report, the Debtor and non-debtor objectors finally agreed to produce certain categories of documents. However, **to date neither the Debtor nor the non-Debtor objectors have produced a single document in response to the Rule 2004 Motion and have made no witnesses available for interviews or depositions**.

At every turn, the Debtor and its affiliates has frustrated even limited attempts by T-Mobile to investigate the Debtor's financial condition and affiliate connections. T-Mobile has requested that the Debtor make its CFO available for an informal interview by T-Mobile's financial advisor pursuant to the requirements of this Court's Cash Collateral Order, Dkt. 70. However, the Debtor has not yet made its CFO available. The CFO and Debtor's counsel declined to appear at two scheduled meetings on January 16, 2025, and January 22, 2025.

T-Mobile has formally requested that PWW provide financial information pursuant to certain contractual provisions of the WSA. However, PWW has taken the position that it has no contractual obligation to do so.

Notwithstanding the serious issues raised in T-Mobile's Rule 2004 motion papers regarding evidence of fraudulent transfers, misstatements to the Court, and serious management integrity issues, T-Mobile has managed to reach an agreement with the Debtor on only a limited, core set of documents that both the Debtor and PWW are to produce for the period of January 1, 2023 onward.

Until February 28, 2025—the date that the parties' status report was due—it had been the Debtor's position that, in exchange for its agreement to produce these core documents, T-Mobile

must abandon all other requests for searches of emails, depositions and any discovery into the Debtor's affiliates and Q Link. Under the circumstances, T-Mobile was unable to so agree. Because T-Mobile had been unwilling to waive all other Rule 2004 discovery rights, the Debtor has refused to produce any documents, including the core set of documents that it has conceded should be produced. Notwithstanding the eleventh-hour change of heart prompted by this Court's deadline to submit a joint status report, the Debtor still makes no promises as to <u>when</u> it will even start producing documents.

As to the non-Debtor objectors, it had been their position that they should not be required to produce any documents or engage in any discovery despite being intertwined with Debtor and allegedly being a source of collateral upon which Debtor intends to draw in its reorganization plan. Again, on February 28, 2025, the non-Debtor objectors modified their position but are still refusing to produce basic financial information about these interconnected businesses. As to the limited documents they say they will produce, the non-Debtor objectors are also silent on when such production will occur. The right for a party in interest such as T-Mobile to examine the Debtor and other entities is fundamental where, as here, good cause has been shown. There is no authority permitting the Debtor to delay and evade an investigation into its financial affairs.

The urgent need for Rule 2004 discovery into the financial condition of the Debtor and its affiliates is underscored by the fact that the Debtor's Plan proposes to fund the Debtor's obligations through tens of millions of dollars in contributions from its affiliates, PWW and X Wireless. As such, information not only from the Debtor but from its interrelated entities is critical to analyzing the viability of the Plan.

## VI.    THE DISCLOSURE STATEMENT AND PLAN

On February 18, 2025, the Debtor filed its Disclosure Statement and Plan, which envision

the Debtor's assumption of the WSA, which to date the Debtor has not assumed or rejected.

On March 13, 2025, T-Mobile filed a Section 506 motion to value its secured claims, which motion is set for hearing on May 7, 2025. Dkt. 122.

As explained below, the Disclosure Statement fails to provide adequate financial information regarding Debtor's operations and the Plan is patently unconfirmable. Consequently, the Court should not approve the Disclosure Statement.

## **ARGUMENT**

T-Mobile objects to the Disclosure Statement on the grounds that the Debtor's underlying Plan is patently unconfirmable and because the Disclosure Statement does not provide "adequate information" as required under section 1125(b) of the Bankruptcy Code.

The Disclosure Statement lacks important information such as: (a) a proposed plan treatment for all of T-Mobile's claims, which comprise more than 90% of all non-governmental claims; (b) financial information and projections for the Debtor's subsidiary and affiliate that will allegedly be contributing the funds necessary for the vast majority of the plan payments; (c) evidence that the Debtor's plan funders agree to be bound by, and guaranty payments under, the Plan; (d) the cure amount associated with the Debtor's proposed assumption of the WSA; and (e) the specific revisions to the Debtor's contract with T-Mobile that the Debtor (improperly) seeks the Court's approval to make unilaterally against T-Mobile's objection. The Debtor fails to satisfy its burden under Section 1125 to prove that its Disclosure Statement provides adequate information. *See In re Michelson*, 141 B.R. 715, 720 (Bankr. E.D. Cal. 1992) ("[T]he plan proponent bears the ultimate risk of nonpersuasion on the question of compliance with the requirement to disclose adequate information and must bear that burden twice—once at the hearing on the disclosure statement pursuant to section 1125 and once again at confirmation pursuant to

11

section 1129(a)(2)"; *In re Celebrity Resorts, LLC*, No. 6:10-BK-03550-ABB, 2010 WL 5392657, at *7 (Bankr. M.D. Fla. Dec. 28, 2010) (same).

Additionally, the plan is unconfirmable because, among other things: (a) the Plan and Disclosure Statement fail to address all of T-Mobile's claims; (b) the Debtor's proposed plan contributions are illusory and non-binding on the contributing parties; (c) the Debtor improperly seeks to modify its agreement with T-Mobile; (d) the Debtor seeks an impermissible assumption of the WSA; (e) the Debtor seeks to reduce the assumption cure cost in violation of the WSA; (f) the Debtor impermissibly gerrymanders T-Mobile's claims to engineer a potential accepting impaired class; and (g) the Debtor artificially impairs Class 4 claims to engineer a potential accepting impaired class. *See In re Harenberg*, 491 B.R. 706, 717 (Bankr. D. Md. 2013) ("While it is true that the . . . hearing was a disclosure statement (and not a confirmation) hearing, the Amended Disclosure Statement and the Amended Plan are woven of the same fabric and together are fatally defective. A disclosure statement that describes a plan that cannot be confirmed—one that is incapable of satisfying Section 1129(a)—cannot be approved."); *see also In re 206 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996); *In re Felicity Assocs.*, 197 B.R. 12, 14 (D. R.I. 1996).

Section 1125(b) of the Bankruptcy Code gives the Court the authority to decline approval of a disclosure statement if it does not give "adequate information" to the entities that will have to vote on the plan. "If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation." *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). "Not only would allowing a nonconfirmable plan to accompany a disclosure statement, and be summarized therein, constitute inadequate information, it would be misleading and it would be a needless expense to the estate." *Id.* "If the Court can

180616577.1

determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate." *Id.* "Although a debtor may not be required at the hearing on the disclosure statement to show that the plan conforms to all the requirements mandated by § 1129, should the contents of the disclosure or the plan reflect an inability to comply with those requirements, the Court may decline approval of the disclosure statement." *Id.*; *see also In re CHL, LLC*, No. 18-00630-5-DMW, 2018 WL 3025310, at *4 (Bankr. E.D.N.C. June 14, 2018) ("The court also is restricted from approving a disclosure statement if the associated plan of reorganization cannot be confirmed. . . . This determination prevents the parties from undergoing a costly confirmation process that will not be successful based on the proposed terms of a plan.").

## I.    THE PLAN IS UNCONFIRMABLE

In this case, denying approval of the Disclosure Statement is necessary to avoid wasting the resources of the Court and all parties by fruitlessly soliciting votes for the Plan, which cannot be confirmed. The Plan is unconfirmable for multiple reasons.

### A.    The Disclosure Statement and Plan fail to address all of T-Mobile's claims

The Disclosure Statement and Plan is unconfirmable because it fails to address and provide a proposed treatment for two sizeable claims that T-Mobile filed against the Debtor's estate, namely T-Mobile's secured claim for $31,153,008 relating to the rescission of the August 19, 2024 credit and T-Mobile's unsecured claim for $4,278,428 relating to Q-Link. The Disclosure Statement states that T-Mobile asserts a total claim in the amount of $32,900,000, and that unsecured claims asserted by other creditors total $4,326,853.71. The Debtor proposes to pay those claims through a combination of its cash of hand and voluntary contributions totaling $46 million from its subsidiary, PWW, and affiliate, X Wireless, during the plan payment period. As discussed

180616577.1

below, the proposed contributions are illusory and non-binding and thus the Court should not consider them in evaluating the feasibility of the Plan and the adequacy of the Disclosure Statement. However, even if the proposed plan contributions are not illusory, the Debtor has failed to submit a plan that provides treatment for and payment of all of the claims asserted against its estate.

As discussed above, T-Mobile filed two secured proofs of claim totaling $63,067,965.20, which consist of a $32,914,957.18 secured claim for unpaid pre-petition services (the "Services Claim") and a $31,153,008 secured claim for recission of a pre-petition bill credit (the "Recission Claim"). *See* Claim Nos. 21 and 20, respectively. T-Mobile also filed a $4,278,428 unsecured proof of claim for damages relating to the Debtor's breach of the WSA relating to its transfer of Q Link subscribers (the "Q Link Claim"). *See* Claim No. 19. The Plan provides a proposed treatment of the Services Claim in Class 1 of the Plan, to which T-Mobile objects, but the Plan fails to provide a proposed treatment for the Recission Claim and the Q Link Claim.

All of T-Mobile's filed claims relate to the Debtor's breaches of the WSA and thus, because the Debtor seeks to assume the WSA in its Plan, the Debtor must pay all of T-Mobile's claims in full pursuant to Section 365 of the Bankruptcy Code. The Debtor's proposed funding for its plan payments (using cash on hand and $46 million of contributions) falls far short of paying all of T-Mobile's WSA claims. Thus, the Plan is wholly unworkable and unfeasible. Additionally, the Disclosure Statement fails to provide an analysis of the feasibility of the Debtor's payment of all of T-Mobile's claims.

### B.    The Debtor's proposed plan contributions are illusory and non-binding

The Debtor proposes to fund its plan payments and its continued post-petition operations as a going concern with a combination of cash on hand, $22 million in transfers from its subsidiary,

14

PWW, and $24 million in transfers from its affiliate, X Wireless. The proposed contributions are wholly illusory. In its Disclosure Statement, the Debtor has failed to provide: (1) any information regarding the current funds held by either PWW or X Wireless; and (2) projected financials for PWW and X Wireless during the proposed 12-month plan repayment period. The Debtor has provided **zero** evidence that either PWW or X Wireless have sufficient available funds to contribute any of the $46 million that the Debtor claims they will contribute to fund the Plan, let alone another $35,000,000 to pay all of T-Mobile's claims.

Courts deny plan confirmation and dismiss bankruptcy cases where a debtor's plan relies on illusory funding. *See, e.g., In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 58-59, 62 (B.A.P. 6th Cir. 2013) (affirming the bankruptcy court's dismissal of a chapter 11 case where Alliant Capital, an entity affiliated with the debtors, was designated in the debtors' plan of reorganization as funding source for the plan and shortfalls thereunder, the debtors did not disclose what Alliant Capital was receiving in exchange for agreeing to provide the funding, the debtors' projections showed they would only be able to make their proposed payments with the assistance of Alliant Capital, and that therefore "Alliant Capital's commitment to fund the [debtors'] plan was 'illusory'" and the debtors did not have reasonable likelihood of rehabilitation under Section § 1112(b)(4)(A)); *In re Northbelt, LLC*, No. 19-30388, 2020 WL 5240391, at *3 (Bankr. S.D. Tex. Sept. 2, 2020) ("The Court finds that Debtor fails to establish feasibility in its Modified Plan. [W]hile Dr. Testa testified that he would fund any shortfall of payments set forth in the Modified Plan, his promise remains non-binding and illusory. There is no recourse for Dr. Testa's failure to fund the Debtor under the Modified Plan. As such, the Court finds that the Debtor's Modified Plan fails to satisfy § 1129(a)(11).").

The Plan also fails to bind PWW and X Wireless. PWW and X Wireless are not co-debtors

15

in this bankruptcy case, and so they have no legal obligation to fund the Plan. While PWW is a wholly owned subsidiary of the Debtor, the Disclosure Statement offers no evidence that such corporate control necessarily requires PWW to make a contribution, and the Plan conspicuously fails to require PWW to guaranty the plan payments. Additionally, the Debtor has no corporate control over its affiliate X Wireless and does not propose to have X Wireless guaranty the plan payments. It is truly an unconfirmable "trust me" plan.

Further, as previously discussed, in any assumption of the WSA, the Debtor must cure all of its breaches. The damages associated with the Debtor's breaches under the WSA total $63,067,965.20, as described in the Services Claim, the Recission Claim and the Q Link Claim, all of which the Debtor must pay to assume the WSA. The Debtor has failed to show any evidence in its Disclosure Statement of an ability to pay T-Mobile $63 million, either on its own or through contributions from third parties. The Plan is accordingly unconfirmable and the Disclosure Statement fails to provide a realistic feasibility analysis and adequate information in contravention of Section 1125(b) of the Bankruptcy Code.

### C.    The Debtor improperly seeks to modify the WSA in its Plan

In the Disclosure Statement and Plan, the Debtor impermissibly proposes that the Court has authority to, and should, make unspecified modifications to the key financial terms of the WSA. The Court has no authority to unilaterally rewrite an executory contract, as part of a confirmation hearing or otherwise, and the Debtor agreed to binding arbitration in the WSA to resolve any disputes regarding the terms of the WSA. Further, even if the Court could adjudicate a dispute regarding the terms of the WSA, the Debtor has failed to state the exact financial changes that it requests that the Court make to the WSA and thus the Plan and Disclosure Statement are too vague and ill-defined to be feasible.

### 1.     The Debtor and the Court cannot prospectively modify the WSA

It is black letter law that a bankruptcy court cannot modify the terms of an executory contract. *See In re Trak Auto Corp.*, 367 F.3d 237, 244 (4th Cir. 2004) ("[B]ecause A & E does not propose to take the West Town lease subject to the specific restriction limiting use of the premises to the sale of auto parts and accessories, [the debtor's] motion to assume and assign the lease must be denied. . . . [I]n its lease with [the debtor], West Town successfully negotiated to have the leased space dedicated to the sale of auto parts. West Town insists that this use restriction be honored by any assignee of [the debtor], and that is West Town's right under § 365(b)(3)(C), regardless of market conditions. Section 365(b)(3)(C) simply does not allow the bankruptcy court or us to modify West Town's 'original bargain with the debtor.'"); *In re Wash. Capital Aviation & Leasing*, 156 B.R. 167, 173 (Bankr. E.D. Va. 1993) (holding that "[T]he assumption of an unexpired lease pursuant to § 365 does not augment a debtor's rights under the contractual agreement other than to permit a debtor to cure defaults, ignore ipso facto clauses, and resume its contractual obligations if the statutory tests are met", and finding that a plan that purported to require a lessee to make security deposit not required by the underlying agreement was "an obvious attempt by the debtor to effectively force [creditor] to provide financing for the debtor's reorganization"); *In re Allegheny Health, Educ. & Research Found.*, 265 B.R. 88, 113 (Bankr. W.D. Pa. 2001) (holding that the bankruptcy court had no jurisdiction under § 365 to alter, enlarge or redefine the terms and conditions of the original contract assumed and assigned); 3 Collier on Bankruptcy P 365.06 (16th 2025) ("The trustee takes executory contracts and leases as they are, subject to all of their provisions except those rendered unenforceable by applicable nonbankruptcy law or section 365."). There is simply no case law holding that a chapter 11 bankruptcy case or the plan confirmation process grants a debtor any right to modify executory contracts.

2.     **The Court cannot prospectively modify the WSA because any disputes thereunder are subject to mandatory arbitration**

Further, any dispute that the Debtor has regarding the terms of the WSA is subject to mandatory arbitration under Section 14.12(b) of the WSA. Section 14.12(b) states:



This Court must enforce the arbitration provision in the WSA and deny any attempt by the Debtor to litigate, within a plan confirmation context or otherwise, issues relating to the terms of the WSA.

The Arbitration Act, 9 U.S.C. § 1 *et seq.*, "makes a written agreement to arbitrate 'in any . . . contract evidencing a transaction involving commerce valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625–26 (1985) (quoting 9 U.S.C. § 2). "The 'liberal federal policy favoring arbitration agreements,' manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements: the Act simply 'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'" *Id.* (internal citations omitted). "'[T]he preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered,' a concern which 'requires that we rigorously enforce agreements to arbitrate.'" *Id.* (internal citations omitted). The Fourth Circuit in *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir.

18

1997), held that "arbitration 'should not be denied unless it may be said with positive assurance that the arbitration agreement is not susceptible of an interpretation that covers the asserted dispute.'" "[T]he court will enforce the arbitration provisions, like other contracts, according to their terms and determine the applicability of an arbitration agreement to a particular dispute according to state law principles of contract interpretation." *In re Startec Glob. Commc'ns Corp.*, 300 B.R. 244, 250 (D. Md. 2003).

The Fourth Circuit has held that while constitutionally core matters under 11 U.S.C. § 157(b)(2) may be adjudicated by a bankruptcy court in its discretion despite a binding arbitration clause in a contract, statutorily core and constitutionally non-core matters that are subject to a binding arbitration clause should be arbitrated. *See Moses v. CashCall, Inc.*, 781 F.3d 63, 70–71 (4th Cir. 2015) (holding that the district court erred in refusing to refer to arbitration a statutorily core, but constitutionary non-core, claim for damages under the North Carolina Debt Collection Act); *see also In re McPherson*, 630 B.R. 160, 166, 168-69 (Bankr. D. Md. 2021) ("The presence of the arbitration clause requires this Court to pause, however, and determine the appropriate forum to resolve some or perhaps all of the parties' respective claims. . . . [E]ven if suboptimal for this case, applicable law requires some bifurcation of the parties' claims between this bankruptcy case and the prepetition arbitration proceeding. . . . If a claim is a constitutionally core proceeding, the bankruptcy court has the discretion to retain the proceeding and not enforce the terms of the parties' arbitration agreement. . . . Again, this discretion arises from the inherent conflict in allowing an arbitrator to resolve proceedings that are grounded in the Code itself or that are integral to the debtor's reorganization efforts. A bankruptcy court's discretion is far more limited with respect to nonconstitutionally core or non-core proceedings. Indeed, some circuit courts have concluded that a bankruptcy court generally has no discretion to 'refuse to arbitrate a non-core claim.' . . . The

19

Court thus has undertaken a broad review of the case law addressing the interplay of the FAA and the Code. Based on that review and the general principles articulated in those cases, the Court concludes that it must allow Camac to arbitrate certain state law issues in this case, despite the potential attendant delay and adverse effects on the Debtor's estate."); *In re Barker*, 510 B.R. 771, 779–80 (Bankr. W.D.N.C. 2014) ("Debtor's causes of action against CMH are not core. Even if Debtor's causes of action against CMH were core, or even constitutionally core, there would be no conflict between arbitration and the underlying purposes of the Bankruptcy Code, as there would be no prejudice to the administration of the bankruptcy case and no negative impact on the determination of bankruptcy issues if Debtor's causes of action against CMH are arbitrated. To the contrary, it would be helpful to the Court and more efficient and cost-effective for the parties if Debtor's state law causes of action against CMH proceed in arbitration, after which this court can address any bankruptcy implications of the arbitrator's decision concerning the state law claims.").

"In the bankruptcy context, . . . 'the burden is on the party opposing arbitration to show that Congress intended to 'limit or prohibit waiver of a judicial forum for a particular claim' under the Federal Arbitration Act.'" *In re TP, Inc*., 479 B.R. 373, 382 (Bankr. E.D.N.C. 2012) (referring non-core claims to arbitration). "Thus, if the matter is non-core, it is generally referred to arbitration consistent with the policy in favor of arbitration; however if a core proceeding is at issue, the policy in favor of centralized determination in the bankruptcy court generally prevails." *Id.*

Here, the Disclosure Statement and Plan hinge on the Debtor's request that the Court interpret and modify the express terms of the WSA to reduce the Debtor's financial obligations to T-Mobile, pay T-Mobile less and provide less security to T-Mobile. The Debtor requests that "[a]s

20

part of the Court's determination of the terms and conditions for the Debtor's assumption of the WSA, [several provisions] of the WSA shall be . . . interpreted by the Bankruptcy Court to resolve the disputes between the parties with respect to each such provision." Disclosure Statement at 8.3. All of the Debtor's requests seek interpretation and modification of the WSA, which is an agreement governed by Washington state law, and are thus expressly non-core matters. They are not constitutionally core matters under Section 157(b) of the Bankruptcy Code or statutorily core matters. Accordingly, the Court should refer any such disputes regarding the terms of the WSA to arbitration.

### D.    The Debtor's proposed modifications to the WSA are impermissible

The Debtor proposes three modifications to the WSA, none of which are permissible under the agreement. Section 14.5(b) of the WSA requires that ███████████████████████████ ████████████████████████████████████████

First, the Debtor proposes that the Court rewrite the WSA to eliminate the Debtor's requirement, which was triggered pre-petition, to provide T-Mobile with a security deposit. Section 8.3(a) of the Disclosure Statement states:

> (a) Security Deposit. So long as the Debtor has paid T-Mobile's invoices currently during the period after the Petition Date and prior to the Confirmation Date, the Debtor shall not be required to provide T-Mobile with additional security pursuant to Section 7.6(iii) of the Thirteenth Amendment for the nine-month period during which the Reorganized Debtor is paying T-Mobile's Class 1 Claim pursuant to Paragraph 8.2(b)(ii) above;

On September 6, 2024, following the Debtor's repeated breaches of the payment terms of the WSA, T-Mobile demanded under Section 7.6(a)(iii) of WSA that the Debtor provide T-Mobile with $33,224,873.37 of additional security, calculated as per the terms of the WSA ██████████ ████████████████████████████████████████████████████████

████. A copy of T-Mobile's September 6, 2024 letter is attached as <u>Exhibit B</u>. Section 7.6(a)(iii)

states that ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    Section 7.6(a)(iii) further provides that ███████████

████████████████████████████████████████████████████████

██████████████████████████████████████

Instead of providing the additional security, the Debtor filed its chapter 11 petition on the deadline for the security to be provided to T-Mobile. The Court cannot rewrite the WSA to remove the Debtor's obligation to provide the additional security. Additionally, the Debtor's failure to provide the additional security is a financial breach of the WSA and thus must be cured as part of the Debtor's assumption of the WSA pursuant to Section 365(b)(1)(A) of the Bankruptcy Code. The Disclosure Statement and Plan fail to provide for the posting of the additional security with T-Mobile and the Debtor's feasibility disclosure shows no ability of the Debtor or its plan funding sources to fund the additional security. Moreover, the Debtor's request to excuse its requirement to provide additional security under the current circumstances is untenable. The Debtor has shown that it is unable to fund its Plan without $46 million of contributions from non-debtors, the Debtor has a pre-petition history of non-payment and late payment, the Debtor has experienced a significant decline in revenue post-petition and its financial projections show an even greater expected decline. Yet, the Debtor seeks to provide T-Mobile with less security post-confirmation than the Debtor agreed to provide when it executed the WSA. The Debtor's failure to provide the additional security in its Plan fails to provide T-Mobile with adequate assurance of the Debtor's future performance pursuant to Section 365(b)(1)(A) of the Bankruptcy Code.

Second, the Debtor proposes that the Court rewrite the WSA to reduce the Debtor's Minimum Purchase Guarantee thereunder. Section 8.3(b) of the Disclosure Statement states:

180616577.1

(b) Determination of Reduction of Minimum Purchase Guarantee. Pursuant to the Thirteenth Amendment, Schedule B, Paragraph 2.2(C), the Debtor is entitled to a reduction of the Minimum Purchase Guarantees ("MPG") amounts set forth in the "MPG Table", as a result of the "ACP Program" having been terminated. If the Debtor and T-Mobile agree on the amount of the reduced MPG prior to the Confirmation Date, then the reduced MPG will be as agreed by the parties. In the absence of any such agreement, the Bankruptcy Court will determine the reduced amount of the MPG as part of the Confirmation Hearing or as otherwise directed by the Bankruptcy Court.

As previously discussed, the Court has no authority to modify the WSA, either to reduce the Debtor's Minimum Purchase Guarantee thereunder or otherwise, and any dispute regarding the terms of the WSA is subject to mandatory arbitration under Section 14.12(b) of the WSA.

Moreover, as T-Mobile would demonstrate in an arbitration proceeding, the Debtor is not entitled to a reduction of its Minimum Purchase Guarantee (the "MPG") under the WSA. Schedule B, Section 2.2(C) of the Thirteenth Amendment to the WSA states that █████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ T-Mobile and the Debtor must first determine whether or not the FCC or another government agency plans to replace the ACP Program before any discussion of a reduction in the MPG can be contemplated. Indeed, the Debtor's Chief Financial Officer, Mr. Walden, stated under oath at the Debtor's 341 Meeting that while "[t]he ACP program ran out at June 1st [2024]," he "do[es] think [there] will be some sort of revision to a USF program, another government program" and that "we do think that something will be reworked on a go-forward basis." Further, Section 2.2(C) states that █████████████████████████████████████████████████████ ████████████████████████████████ Under Section 14.14 of the WSA, ████████ ███████████████████████████████████████████████████████████████ █████████████████████████ Accordingly, the amount of any reduction in the MPG, if any, is at T-Mobile's discretion, and not subject to determination by a judge or arbitrator.

180616577.1

Third, the Debtor proposes that the Court rewrite the WSA to reduce the rates charged by T-Mobile to the Debtor. Section 8.3(c) of the Disclosure Statement states:

> (c) Review and Reduction of Rates Charged by T-Mobile under the WSA. Pursuant to the Thirteenth Amendment, Schedule B, Paragraph 2.4, the Debtor maintains that it is entitled to a "Rate Review" because the current rates T-Mobile charges PWG does not enable the Debtor to be competitive in the marketplace and are higher than T-Mobile charges other similar customers. . . . If the Debtor and T-Mobile to not reach agreement on the results of a Rate Review prior to the Confirmation Date, then the Bankruptcy Court will determine what if any rate changes to which the Debtor is entitled pursuant to the Thirteenth Amendment, Schedule B, Paragraph 2.4 as part of the Confirmation Hearing or as otherwise directed by the Bankruptcy Court.

As previously discussed, the Court has no authority to modify the WSA, either to reduce the rates that T-Mobile charges thereunder or otherwise, and any dispute regarding the terms of the WSA is subject to mandatory arbitration under Section 14.12(b) of the WSA.

As T-Mobile would demonstrate in an arbitration proceeding, the Debtor is not entitled to Rate Review under the WSA. The WSA rates were the result of good faith arm's length negotiations between T-Mobile and the Debtor. And, any rate modification under the WSA is in T-Mobile's sole discretion. Schedule B, Section 2.4 of the Thirteenth Amendment to the WSA states that ███████████████████████████████████████████████████████ ████████████████████████████ The Debtor is not in compliance with all of the terms and conditions of the WSA, and has not been for some time. For example, the Debtor: (1) remains approximately $33 million in arrears on its pre-petition invoices; (2) induced T-Mobile to issue a bill credit through materially false misrepresentations; (3) rejected the clear payment and informational obligations of its subsidiary, PWW, under the WSA; and (4) has breached the confidentiality provisions of the WSA.

Additionally, even if the Debtor was in compliance with all terms and conditions of the WSA, any rate review under Section 2.4 is further predicated on ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

The Debtor has made no such request. Finally, any such rate review under Section 2.4 is ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Under Section 14.14 of the WSA, █████████████████

███████████████████████████████████████████████████

████████████████████ Accordingly, the amount of any rate reduction, if any, is at T-Mobile's

discretion, and not subject to determination by a judge or arbitrator.

**E.    The Debtor seeks an impermissible assumption of the WSA**

In its Plan and Disclosure Statement, the Debtor states that it seeks to assume the WSA. However, the Debtor wants the benefits of assumption without its attendant obligations under Section 365(b). The Debtor cannot have it both ways.

Under Section 365(b)(1), "If there has been a default in an executory contract . . . the trustee may not assume such contract . . . unless, at the time of assumption of such contract . . ., the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract . . ., for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

Under the Bankruptcy Code and Fourth Circuit case law, an executory contract can only be assumed if the debtor: (a) cures, or provides adequate assurance that the debtor will promptly cure, such default; and (b) provides adequate assurance of future performance. *See In re Harrell*

25

*Oil Co.*, 38 B.R. 280, 281–82 (Bankr. E.D. N.C. 1984) (citing 11 U.S.C. § 365(b)(1)); *see also In re United Am., Inc.*, 327 B.R. 776, 786 (Bankr. E.D. Va. 2005) (approving assumption of executory contract with electrician subject to payment of prepetition debt, but denying assumption of executory contract with cabinet supplier whose cure amount was deemed too high); *In re Liggins*, 145 B.R. 227, 231 (Bankr. E.D. Va. 1992) ("Section 365(b)(1)] requires a debtor, prior to assuming a lease or executory contract, to cure the default in payment or provide adequate assurance of a prompt cure of default.").

The Plan and Disclosure Statement fail to comply with Section 365(b)(1)'s clear requirements for assumption of the WSA because the Debtor refuses to cure its financial breaches of the WSA by the confirmation date under Section 365(b)(1)(A), fails to provide adequate assurance that the Debtor will promptly cure its breaches under Section 365(b)(1)(A), and fails adequate assurance of its future performance under the WSA under Sectio 365(c)(1)(C).

### 1.    The Debtor is unwilling to timely cure its WSA breaches

The Debtor fails to provide T-Mobile with a cure of its financial breaches under the WSA by its proposed plan confirmation date, and fails to provide adequate assurance that the Debtor will promptly cure such breaches, in violation of Section 365(b)(1)(A) of the Bankruptcy Code. The Plan is thus unconfirmable.

The Plan fails to cure its WSA breaches at the time of its assumption. The Debtor proposes to assume the WSA, but delay paying the cure costs associated with the assumption over a nine-month period post-confirmation. Pursuant to Section 365(d)(2): "In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract . . . of the debtor at any time before the confirmation of a plan . . ." Consistent with the express terms of Section 365, the Supreme Court has held that the "decision whether to reject a contract or lease must be made before

confirmation." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc*., 554 U.S. 33, 46 (2008); *see also In re Quinones Ruiz*, 98 B.R. 636, 638 (Bankr. D. P.R. 1988) ("the debtor has until the confirmation of the plan to assume an executory contract. . . . the debtors must cure all defaults prior to the assumption.").

Additionally, the Debtor's proposed 9-month cure repayment period fails to provide adequate assurance that the Debtor will promptly cure its WSA breaches. *See In re Allison*, No. 95-10776-AM, 1995 WL 930889, at *2-3 (Bankr. E.D. Va. Sept. 14, 1995) ("The reported cases on what constitutes a 'prompt' cure do not provide any sort of bright line test. In at least one case, prompt cure meant an immediate payment. . . . The arrearage in the present case amounts to somewhat more than 6 months of payments on the lease, and the lease, counting from the first payment due under the plan, has approximately 48 months to run. Under the circumstances, this court cannot find that any period in excess of one year . . . would constitute a 'prompt' cure of the payment default. Accordingly, the court will sustain the objection to confirmation.") (citing *In re Lafayette Radio Electronics Corp*., 9 B.R. 993 (Bankr. E.D.N.Y. 1981); *Cole v. Kramer Suburban Car Wash Enters., Inc*., No. CIV. HAR-91-3430, 1992 WL 62144, at *2 (D. Md. Mar. 17, 1992) ("Under relevant caselaw, Cole's proposal to cure the arrearage over a seven month period does not constitute "prompt cure"); *In re Durant Realty Co., Ltd*., 76 B.R. 211, 212 (Bankr. S.D. Fla. 1987) (". . . without the creditor's consent, that delay, I am convinced, must be so brief as to be deemed inconsequential, that is to say, not more than the time it would take the creditor to enforce its lien under available State remedies. A six-month delay is clearly unreasonable in this instance, and this is the shortest interval proposed by the debtor."); *In re Bon Ton Rest. & Pastry Shop, Inc*., 53 B.R. 789, 805 (Bankr. N.D. Ill. 1985) ("In ruling on the question of assumption of an unexpired lease, the court must be reasonably satisfied that if the debtor is not going to cure a default

27

immediately, it will be able to do so within a period of time deemed to be prompt which varies according to the circumstances of a particular case. The court holds that debtor's cure of these defaults within ninety days would constitute a prompt cure."). By the proposed August 1, 2025 effective date of the Plan, there will be merely ▮ months left on the WSA before it expires.[1] Under the circumstances of this case, the Debtor should be required to cure its WSA breaches immediately upon the effective date of any plan.

Notably, where a debtor's cash position is insufficient to cure an executory contract, courts have held that the debtor is unable to provide adequate assurance of a prompt cure. *See, e.g., In re MP Invs., L.L.C.*, No. 10-02659-ALS11, 2010 WL 7609465, at *4 (Bankr. S.D. Iowa Nov. 18, 2010) ("Even if a prompt cure was permitted over the course of twelve months, MPI's cash position is substantially less than would be needed to pay the outstanding pre-petition defaults. The Debtor, therefore, has not provided adequate assurance of a prompt cure."). Here, the Debtor's cash on hand is substantially insufficient to pay T-Mobile's Services Claim, let alone its Recission Claim, its Q Link claim and the additional security deposit owed under Section 7.6(a)(iii) of the WSA.

The Debtor's feasibility analysis, and the proposed contributions from PWW and X Wireless to fund the Plan, are all premised on the Debtor being permitted, contrary to Section 365(b)(1)(C), to pay cure costs to T-Mobile over a 9-month period post-confirmation. Accordingly, the Plan is unconfirmable and the Disclosure Statement fails to provide a viable feasibility analysis for assumption of the WSA.

### 2.     The Debtor fails to provide adequate assurance of its future performance

The Debtor also fails to provide T-Mobile with adequate assurance of its future

---

[1] Pursuant to Section 6 of the Thirteenth Amendment to the WSA, the agreement expires on ▮▮▮▮▮, but will automatically renew ▮▮▮▮▮ ▮▮▮▮▮▮▮. T-Mobile is informed and believes that the Debtor does not intend to renew the WSA.

performance under the WSA in violation of Section 365(b)(1)(C) of the Bankruptcy Code and thus its Plan is unconfirmable.

The Bankruptcy Code does not define "adequate assurance of future performance." However, the legislative history of Section 365(b)(1)(C) states that the phrase "adequate assurance of future performance" derives from Article 2 of the Uniform Commercial Code. H.R. No. 93–137, 93d Congress, 1st Sess. Pt. II p. 156–57 (1973) ("The language quoted [adequate assurance of future performance] is adapted from Uniform Commercial Code Section 2–609(1)"). Section 2–609 of the UCC provides that "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." U.C.C. § 2–609. Thus, "adequate assurance of future performance under Section 365(b)(1)(C) "is appropriate and necessary where the counter-party has reasonable grounds for insecurity with respect to the debtor's ability to fully perform its obligations under the contract." *In re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005).

"[W]hile an absolute guarantee of future performance is not required under § 365(b)(1)(C), more than the debtor's speculative plans are needed." *In re Washington Cap. Aviation & Leasing*, 156 B.R. 167, 173–74 (Bankr. E.D. Va. 1993). In *Washington Capital*, the bankruptcy court held that the debtor's plan was unconfirmable where the plan relied on a non-debtor depositing funds post-confirmation into an escrow to fund the plan, the non-debtor did not offer a personal guaranty of the plan payments, and accurate financials for the non-debtor were not provided. *See id.* ("Dr. Asterbadi proposes to deposit $25,000.00 from his personal funds in escrow 60 days hence and another $25,000.00 60 days thereafter as a means of providing adequate assurance of future

performance by the debtor. However, Dr. Asterbadi is not proposing to personally guarantee the debtor's obligations under the lease, and the only evidence presented on Dr. Asterbadi's financial condition was a brief compilation that did not conform to generally accepted accounting principles. . . . In sum, the court must conclude that the proposed cash infusion by Dr. Asterbadi is too speculative, insufficient and remote to provide adequate assurance of future performance as required by § 365(b)(1)(C).").

Alarmingly, the Debtor seeks to provide T-Mobile with less assurance of the Debtor's future performance than it agreed to provide under the WSA. In Section 8.3(a) of the Disclosure Statement, the Debtor seeks relief from its requirement under the WSA to provide T-Mobile with additional security totaling ███████████████████████████████. The Debtor: (1) has shown that it has no ability to fund its Plan without $46 million of illusory contributions from non-debtors that are not obligated to fund the plan and have not guaranteed it; (2) has a pre-petition history of non-payment and late payment; and (3) seeks to reduce the protections that the Debtor promised to T-Mobile in the WSA in the event of its breach. Accordingly, the Debtor has failed to provide T-Mobile with adequate assurance of its future performance pursuant to Section 365(b)(1)(A) of the Bankruptcy Code.

### F.    The Debtor seeks to reduce the assumption cure cost in violation of the WSA

The Plan and the Disclosure Statement are premised on the Debtor's assumption of the WSA and the Debtor litigating a reduction of the cure cost to an amount that is less than T-Mobile's $32,914,957.18 Services Claim. There are two issues with the Debtor's proposed cure amount for its breaches of the WSA as part of its assumption under Section 365(b)(1). First, the Debtor's cure proposal fails to provide for the Debtor's: (1) payment of T-Mobile's $31,153,008 Recission Claim and $4,278,428 Q Link Claim; and (2) deposit of the additional security required under Section

30

7.6(a)(iii) of WSA. Second, the Debtor's proposal to litigate the cure cost associated with T-Mobile's Services Claim is fundamentally flawed because the Debtor has waived the right to any potential reduction of that claim.

Section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." *See, e.g.*, *In re Golden Seahorse LLC*, 652 B.R. 593, 605 (Bankr. S.D.N.Y. 2023) ("The meaning of this provision is plain, and most courts have applied § 1123(d) as written, looking to the underlying loan agreement and state law to determine whether a debtor must pay interest at the default rate to cure and reinstate its agreement under a chapter 11 plan."); *In re Magna Ent. Corp.*, No. 09-10720 (MFW), 2011 WL 13509743, at *5 (Bankr. D. Del. May 20, 2011) ("Section 26.2 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All cure amounts will be determined in accordance with the underlying agreements and applicable bankruptcy and nonbankruptcy law."). Accordingly, the WSA's cure costs must be determined in accordance with the terms of the WSA.

In particular, T-Mobile's Services Claim consists of the pre-petition amounts that the Debtor owes under the WSA for network services that T-Mobile provided to the Debtor. Under Section 7.4 of the WSA, the Debtor must dispute any issues with a T-Mobile invoice ▮▮▮▮▮▮ ▮▮▮▮▮▮ of the Debtor's receipt of an invoice. Section 7.4 states:





All of the amounts that comprise T-Mobile's Services Claim were invoiced pursuant to Section 7.4(a) of the WSA, as shown in Claim No. 21, and the Debtor has never disputed the Services Claim invoices pursuant to Section 7.4(b) of the WSA, let alone within ▓▓▓▓▓▓▓▓ Accordingly, the Debtor waived any right to dispute the amounts stated in T-Mobile's Services Claim, and, in turn, waived any ability to dispute the $32,914,957.18 cure cost associated with T-Mobile's Services Claim.

### G.    The Plan impermissibly gerrymanders T-Mobile's Services Claim separate from Class 4 claims to engineer a potential accepting impaired class

The Debtor's Plan is not confirmable because it gerrymanders T-Mobile's Services Claim into its own Class 1, separate from the claims of other trade creditors in Class 4, in an attempt to engineer an accepting impaired class to cram down a plan over T-Mobile's objection.

The Fourth Circuit has adopted a flexible standard that broadly looks at whether plan classifications are, in the context of a particular case, "designed to manipulate class voting." *In re Bryson Props. XVIII,* 961 F.2d 496, 502 (4th Cir. 1992). "If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification

32

scheme violates basic priority rights, the plan cannot be confirmed." *Id.* (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990). Courts within the Fourth Circuit applying this standard have recognized that if a debtor has an independent, good faith, business justification for separate classification (e.g., paying trade creditors on an expedited basis), then the separate classification may be permissible. *See, e.g.*, *CWCapital Asset Mgt., LLC v. Burcam Capital II, LLC*, No. 5:13-CV-278-F, 2014 WL 2864678, at *4 (E.D.N.C. June 24, 2014) ("The court agrees that in the appropriate case paying trade creditors on a shorter time frame than larger institutional creditors is a legitimate business justification for separate classification of otherwise similar unsecured claims, especially if such treatment is necessary for an effective reorganization.") (holding that separate classification of trade claims bought by secured creditor was impermissible gerrymandering). However, "[w]here all unsecured claims receive the same treatment in terms of the Plan distribution, separate classification on the basis of natural and unnatural recourse claims is, at a minimum, highly suspect." *Bryson*, 961 F.2d at 502. In *Bryson*, the Fourth Circuit held that the debtor "failed to offer any reason for separate classification of the unsecured claims which will withstand scrutiny" and that its "classification is clearly for the purpose of manipulating voting and it may not stand." *Id.*

Here, the Debtor's proposed separate classification of T-Mobile's Services Claim is similarly proposed for the purpose of manipulating voting and is thus impermissible. While T-Mobile's Services Claim is secured by the Debtor's assets, it is nevertheless trade debt and is undersecured based on the financial information that the Debtor has thus far provided in its public filings. T-Mobile has filed a Section 506 valuation motion, which is scheduled for hearing on May 7, 2025, to determine the value of its secured Services Claim and Recission Claim, and its unsecured deficiency claims. *See* Dkt. 122.

While the Debtor has failed to provide any justification for its separate classification of T-Mobile's Services Claim from Class 4 claims, any attempt by the Debtor to justify separate classification of any of T-Mobile's undersecured or unsecured claims based on the Debtor's alleged disputes with those claims is impermissible gerrymandering. *See, e.g., In re Midway Invs., Ltd*., 187 B.R. 382, 392 (Bankr. S.D. Fla. 1995) ("Midway's separate classification of disputed unsecured claims is an attempt to gerrymander the voting process to facilitate the affirmative vote of an impaired class of claims and thereby satisfy Section 1129(a)(10); *In re ARN., Ltd. P'ship*, 140 B.R. 5, 13 (Bankr. D. D.C. 1992) ("That the claims are disputed, however, is not a justification for the discriminatory treatment. Moreover, that the claims greatly exceed other general trade claims is no basis for discriminatory treatment: whatever the amount of the Class Five claims."); *In re Weiss–Wolf, Inc*., 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986) (same). There is no valid business justification for classifying T-Mobile's undersecured Services Claim component, undersecured Recission Claim component and unsecured Q Link Claim separate from the claims of other unsecured creditors in Class 4 of the Plan. Accordingly, the Debtor has impermissibly gerrymandered its plan classes and the Plan is therefore unconfirmable.

## H.    The Debtor artificially impairs Class 4 claims to engineer a potential accepting impaired class

In addition to improperly gerrymandering T-Mobile's claims separate from the Class 4 unsecured claims, the Debtor artificially impairs the Class 4 claims in an attempt to engineer an accepting impaired class to cram down a plan over T-Mobile's objection. As disclosed in the Disclosure Statement and its monthly operating reports, the Debtor has cash on hand sufficient to pay all of its proposed Class 4 claims immediately on the effective date of the Plan, yet the Debtor instead proposes to impair those creditors by paying them over a period of 12 months, which is an even longer period than the 9-month period over which the Debtor proposes to pay T-Mobile. Any

impairment of Class 4 is artificial and unnecessary.

Under Section 1129(a)(10) of the Bankruptcy Code, "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." Section 1129(a)(10) "is designed to prevent a plan from being confirmed unless a class of creditors truly impaired by such plan support it." *In re Dunes Hotel Assocs.*, 188 B.R. 174, 185 (Bankr. D.S.C. 1995). "Accordingly, an attempt to manipulate the Chapter 11 process by engineering technical and literal compliance with § 1129(a)(10) by artificially impairing a class of claims in the face of overwhelming opposition by truly impaired creditors constitutes a perversion of Chapter 11." *Id.* "Thus, under § 1129(a)(10), a reorganization plan that does not have support from creditors truly impaired by the plan cannot be confirmed." *Id.* In *Dunes Hotel*, the court denied confirmation of a plan where the debtor's only truly impaired creditor, which held the substantial majority of claims, did not support the plan. *See id.* Similarly, here, the Debtor's only truly impaired creditor, T-Mobile, holds more than 90% of all non-insider, non-governmental, claims and does not support the Plan.

As the *Dunes Court* noted, the "Fourth Circuit Court of Appeals likely would join the Eighth Circuit's condemnation of artificial impairment schemes that are designed to engineer technical compliance with § 1129(a)(10)." *Id.* at 186. "The Fourth Circuit prohibits separate classification of similar claims where such classification is motivated to secure the vote of an accepting, impaired class of claims under § 1129(a)(10)." *Id.* (citing *In re Bryson Props., XVIII*, 961 F.2d 496, 503 (4th Cir. 1992)); *see also In re Swartville, LLC*, No. 11-08676-8-SWH, 2012 WL 3564171, at *3 (Bankr. E.D.N.C. Aug. 17, 2012) ("[C]ourts within the circuit that have speculated on the Fourth Circuit's position on artificial impairment opine that, in light of the Fourth

Circuit's treatment of artificial classification in *Bryson*, it appears likely that the Court would find artificial impairment similarly impermissible.").

As the Fourth Circuit has held, "[t]here must be some limit on the debtor's power to classify creditors. The potential for abuse would be significant otherwise. . . . [I]f the classifications are designed to manipulate class voting, . . . the plan cannot be confirmed." *Bryson*, 961 F.2d at 502. Here, the Debtor's impairment of Class 4 claims is manifestly artificial and a clear attempt to cram down a plan over T-Mobile's objection in violation of Section 1129(a)(10) of the Bankruptcy Code. The Plan is thus unconfirmable.

## II.    THE DISCLOSURE STATEMENT IS FATALLY VAGUE AND INCOMPLETE

This is a "trust me" plan. The Debtor fails to provide adequate information for creditors to assess the viability of its Plan.

Section 1125(b) of the Bankruptcy Code states that a debtor may not solicit acceptance or rejection of a plan of reorganization unless, at the time of or before solicitation, the debtor provides each holder of a claim or interest with a disclosure statement approved by the bankruptcy court that provides "adequate information." *See* 11 U.S.C. § 1125(b). The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtors' books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing such information.

11 U.S.C. § 1125(a).

"The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court." *In re Applegate Prop., Ltd.,* 133 B.R. 827, 829

(Bankr. W.D. Tex. 1991). "A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims on the outcome of the case, and to decide for themselves what course of action to take." *Id.* at 831; *see also In re Ferguson,* 474 B.R. 466, 470-471 (Bankr. D. S.C. 2012) (same) (denying approval of disclosure statement as not containing adequate information).

Courts have identified several categories of key information that should be included in a disclosure statement as a predicate to court approval. These include, among other things:

a. a description of the available assets and their value;
b. the present condition of the debtor while in chapter 11;
c. the scheduled claims;
d. the collectability of accounts receivable;
e. financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
f. the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; and
g. the actual or projected realizable value from recovery of preferential or otherwise voidable transfers.

*See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401-02 (Bankr. S.D. Tex. 2016) (denying approval of an insufficient disclosure statement); *see also In re U.S. Brass Corp.,* 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996); *In re Metrocraft Pub. Servs., Inc.,* 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

The Disclosure Statement fails to provide the following basic and critical information regarding the Plan: (a) the value of Debtor's equity interests in its subsidiary, PWW; (b) all of the claims asserted against the estate, including T-Mobile's $31,153,008 Recission Claim and $4,278,428 Q Link Claim; (c) the collectability of the Debtor's accounts receivable; (d) financial information and projections relevant to creditors' decision to accept or reject the Plan, including, but not limited to, financial projections for PWW and X Wireless, who are allegedly providing the substantial majority of the funding necessary to make payments due under the Plan; and (e) the

37

actual or projected realizable value from recovery of preferential or otherwise voidable transfers, including, but not limited to, the Debtor's June 27, 2024 transfer of $10,000,000 to its majority owner, Greene, for no consideration.

The Debtor is asking the Court and creditors to overlook: (1) the Debtor's inability to fund the Plan with its own money; (2) the Debtor's failure to provide any information regarding the financial wherewithal of the main funding sources of the Plan, PWW and X Wireless; (2) PWW and X Wireless having no binding obligation to fund the Plan; (3) PWW and X Wireless providing no guaranty of the Plan funding; (4) the Debtor's substantially declining post-petition revenue and projected further decline during the plan period; and (5) the Debtor's sole source of revenue being a contract with its subsidiary, PWW, that merely provides the Debtor with capped payments at a percentage of T-Mobile costs and that has required hundreds of millions in voluntary contributions over time. The Debtor has failed to provide this required information to aid creditors and other parties entitled to vote in evaluating the Plan.

The Court cannot approve a disclosure statement under Section 1125(b) that lacks such basic and crucial information. Accordingly, the Court should deny approval of the Disclosure Statement because it fails to provide adequate information to creditors and parties in interest.

## CONCLUSION

For the foregoing reasons, the Court should deny approval of the Disclosure Statement.

Dated: March 26, 2025                           Respectfully submitted,

                                                /s/ David Daniels
                                                David Daniels
                                                Perkins Coie LLP
                                                700 13th Street, NW, Suite 600
                                                Washington, DC 20005

180616577.1

David Gold (*admitted pro hac vice*)
Perkins Coie LLP
110 North Wacker Drive, Suite 3400
Chicago, IL 60606-1511

*Attorneys for T-Mobile USA, Inc.*

180616577.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2025, I reviewed the Court's CM/ECF system, and it reports that an electronic copy of *T-Mobile's Objection to the Disclosure Statement to Accompany Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Proposed by the Debtor* will be served electronically by the Court's CM/ECF system on the following:

Lynn A. Kohen
U.S. Trustee Office
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770
lynn.a.kohen@usdoj.gov

*U.S. Trustee*

Irving Edward Walker
Harry Conrad Jones, III
Cole Schotz P.C.
1201 Wills Street
Suite 320
Baltimore, MD 21231
iwalker@coleschotz.com
HJones@coleschotz.com

Michael Albert Solimani
Cole Schotz P.C.
1325 Avenue of the Americas
Ste Floor 19
New York, NY 10019
msolimani@coleschotz.com

*Counsel to Prepaid Wireless Group LLC*

Meighan Burton
Pascale Stevens, LLC
2700 Lighthouse Point East
Suite 500
Baltimore, MD 21224
mburton@pascalestevens.com

*Counsel to Paul Greene*

*/s/ David Daniels*
David Daniels